IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | |
| Plaintiff, | No. C08-1039 |
| vs. | REPORT AND RECOMMENDATION |
| RICHARD N. HOLLANDER, | |
| Defendant. | |

_____

## TABLE OF CONTENTS

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . .  2

III. ISSUE PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . .  3

IV.  RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . .  3
     A.   Contractual Relationship Between the Parties. . . . . . . . . . .  3
     B.   Termination of Contractual Relationship. . . . . . . . . . . . .  4
     C.   Actions Following Termination of Contractual Relationship. . . . . . . .  5
     D.   Electronic Databases. . . . . . . . . . . . . . . . . . . . .  8

V.   DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . .  9
     A.   The Threat of Irreparable Harm to American Family. . . . . . . . . . 10
     B.   The Balance Between the Harm to American Family and the
          Injury that Granting the Injunction Will Inflict on Hollander. . . . . . 13
     C.   The Probability that American Family Will Succeed on the Merits. . . 14
          1.   Computer Fraud and Abuse Act Violation. . . . . . . . . . . . 15
          2.   Misappropriation of Trade Secrets. . . . . . . . . . . . . . 20
          3.   Breach of Contract. . . . . . . . . . . . . . . . . . . . 24
               a.   Are the Restrictive Provisions of Section 6(k)
                    Enforceable?. . . . . . . . . . . . . . . . . . . . . 24
               b.   Do Hollander's Activities Violate Section 6(k)?. . . . . 28
          4.   Intentional Interference With Contractual Obligations. . . . . . 29
     D.   The Public Interest. . . . . . . . . . . . . . . . . . . . . . 31

*VI.*   *SUMMARY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*VII.*   *RECOMMENDATION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## *I. INTRODUCTION*

On the 8th day of December, 2008, this matter came on for hearing on the Motion for a Preliminary Injunction (docket number 2) filed by Plaintiff American Family Mutual Insurance Company on November 24, 2008. American Family was represented by its attorney, J. Michael Weston. Defendant Richard N. Hollander appeared personally and was represented by his attorneys, Kevin J. Visser, Dawn M. Gibson, and Abbe Stensland.

By agreement of the parties, the record was later supplemented by a Joint Fact Stipulation (docket number 30) filed on January 7, 2009, and a Joint Fact Stipulation (docket number 41) filed on February 2, 2009.

## *II. PROCEDURAL HISTORY*

On November 24, 2008, American Family Mutual Insurance Company initiated the instant action, seeking compensatory damages, punitive damages, injunctive relief, and a declaratory judgment. The Complaint (docket number 1) is brought in five counts and alleges computer fraud, misappropriation of trade secrets, breach of contract, intentional interference with contractual obligations, and a request for declaratory judgment. On January 19, 2009, Richard N. Hollander filed a Partial Motion to Dismiss (docket number 36), which is currently pending before the District Court.

Also on November 24, 2008, American Family filed the instant Motion for a Preliminary Injunction. On the following day, the District Court referred the motion to the undersigned Magistrate Judge for a report and recommendation. The matter was then set for hearing.

## III. ISSUE PRESENTED

American Family asks that a preliminary injunction enter in this case, with the following specific relief requested:

> 1. Prohibiting [Hollander] from violating the terms of paragraph 6k by ordering that he not directly or indirectly induce, attempt to induce, or assist anyone else in inducing or attempting to induce any American Family policyholder credited to his account at the time of his termination to lapse, cancel, replace, or surrender any American Family insurance policy;

> 2. Prohibiting him from contacting any policyholders credited to his account as of the end of his American Family agency;

> 3. Prohibiting him from marketing, touting, quoting, or providing to any policyholders credited to his account as of the end of his American Family agency any information about insurance products competitive to American Family, irrespective of how the contact with Hollander was initiated;

> 4. Prohibiting Hollander from assisting any policyholders credited to his account as of the end of his American Family agency in the act of cancelling their American Family policy(ies).

*See* American Family's Reply (docket number 26) at 12-13.

## IV. RELEVANT FACTS

### A. *Contractual Relationship Between the Parties*

American Family Mutual Insurance Company is an insurance company that sells a broad range of commercial and personal lines of insurance. On June 1, 1982, the parties entered into an agreement (Plaintiff's Exhibit 1) whereby Richard N. Hollander would act as an independent contractor to sell insurance exclusively for American Family. The original agreement was superseded by an "American Family Agent Agreement" (Plaintiff's

Exhibit 2), effective January 1, 1993. Of particular import to the instant action is the paragraph entitled "Your Activity After Termination," which states:

> For a period of one year following termination of this agreement, you will not either personally or through any other person, agency, company or organization directly or indirectly induce, attempt to induce or assist anyone else in inducing or attempting to induce any policyholder of the Companies credited to your account at the time of termination to lapse, cancel, replace or surrender any insurance policy in force with the Companies. In the event the "period of one year" conflicts with any statutory provisions, such period shall be the period permitted by statute.

*See* American Family Agent Agreement (Plaintiff's Exhibit 2), § 6(k) at 5.

## B. Termination of Contractual Relationship

At the instant hearing, Hollander testified that he had thought about terminating his relationship with American Family for a couple of years, but "seriously thought about it" starting in November 2006 when his income started dropping. According to Hollander, American Family's rates are "uncompetitive," making it "nearly impossible" to attract new customers and resulting in the loss of his existing client base. In November 2006, American Family started using "credit based insurance scoring" to establish premiums on homeowner policies, resulting in the premiums going up for a number of customers, which caused them to leave American Family. According to Hollander, he decided to leave American Family when he did because it was going to start credit based insurance scoring on automobile policies as well. Not only would reduced sales lower Hollander's annual income, it would also adversely affect his "extended earnings," to be received following his termination with American Family.

In June 2008, Hollander had discussions with Couri Insurance Associates, a group of independent insurance agencies headquartered in Waukesha, Wisconsin. In order to be affiliated with Couri, it was necessary for Hollander to become incorporated. While the record is somewhat imprecise, Hollander acquired a corporation entitled Albia Associates,

4

Inc. and changed its name to Hollander Insurance Agency, Inc. on June 6, 2008. *See* Articles of Amendment (Plaintiff's Exhibit 8).

At approximately 10:00 p.m. on July 31, 2008, Hollander e-mailed a letter to Steve Goldermann, his immediate supervisor at American Family. The letter advised Goldermann that Hollander was terminating his relationship with American Family after 26 years, effective almost immediately:

> After much thought and consideration, I have decided to end my affiliation as a career agent with American Family Insurance effective at the close of business on July 31, 2008. Therefore, this letter serves as my termination notice to American Family Insurance effective August 1, 2008 at 12:01 A.M. Per the Career Agents Agreement, I will make available the customer files for pickup within 10 days from July 31, 2008. Please contact me to schedule the time and location where these files can be picked up.

*See* Letter from Richard Hollander to Steve Goldermann, dated July 31, 2008 (Plaintiff's Exhibit 4).

### C. *Actions Following Termination of Contractual Relationship*

Hollander prepared a letter to his clients, also dated July 31, 2008, advising them of his decision to "end my affiliation with American Family." Using a list that was generated in September 2007, Hollander sent the letter to "around 1200" clients. The letter, which was mailed on August 1, 2008, is set forth in full below:

> July 31, 2008
>
> To My Valued Clients:
>
> After much thought and consideration, I have decided to end my affiliation with American Family Insurance effective July 31, 2008. On August 4, 2008, I will be opening an independent insurance agency, Hollander Insurance Agency, Inc. I am very excited about this change because I will now be representing several top rated insurance companies, allowing me to offer a diversified selection of competitive Insurance policies to our clients.

Although our office location, phone number and staff will remain the same, I can no longer service any insurance policies that were issued to you by American Family Insurance. You will be contacted by American Family Insurance advising you of the agent to whom your policies have been assigned. If you need service in the meantime, I would advise you to contact American Family at 1-800-692-6326.

If you have any questions concerning this change, please feel free to call me or stop by my office.

This letter is not intended to "induce or attempt to induce any current policyholder to cancel, lapse or surrender any policy in force".

On behalf of my family and myself, I would like to sincerely thank you for allowing us to assist you with your insurance needs over the past years, and for giving us the opportunity to be your insurance agency.

Sincerely,

Rick Hollander

See Letter from Rick Hollander to "My Valued Clients," dated July 31, 2008 (Plaintiff's Exhibit 5).

Hollander testified that after sending the notification letter to his American Family customers, advising them that he had decided to end his affiliation with American Family and would be opening his own independent insurance agency, that he did not initiate any contact with those persons. According to Hollander, the "point" of the next-to-last paragraph in the letter was to "make very clear" that he was not attempting to induce any of American Family's customers to "cancel, lapse or surrender any policy in force." After receiving the letter, however, many of the customers contacted Hollander and requested that he provide them with a quote from another insurance company. After the customer initiated the contact, Hollander would provide the requested quote.

All of the customer files, computers, and printouts of reports containing customer information were returned to American Family shortly after Hollander terminated their agreement. According to Hollander, he did not retain copies of any customer lists, policy expiration dates, or other information which would otherwise enhance his ability to solicit American Family customers. Hollander testified that if a customer contacted his office and requested a quote with another company, then he required the customer to provide all of the necessary information pertaining to the vehicle or property to be insured. In the Joint Fact Stipulation (docket number 41) filed on February 2, 2009, Hollander provided affidavits of eight customers stating that they had initiated contact with Hollander, were told that Hollander had not retained any information regarding their insurance, and that it would be necessary for them to provide all of the required information.

When contacted by a customer and asked to provide a quote from another insurance company, Hollander would have the customer sign a document "verifying" that it was the customer who initiated the contact. Numerous examples were introduced at the time of hearing as Defendant's Exhibit D. The document reads:

> This is to verify that the undersigned individual(s) initiated contact to the Hollander Insurance Agency and was not contacted by any agent, staff member of [sic] representative of the Hollander Insurance Agency for the purpose of soliciting, quoting or enticing me or other members of my household to purchase any insurance products from their agency. The undersigned individual(s) authorize the Hollander Insurance Agency to retain and use confidential information such as Drivers License numbers, Social Security numbers and any other personal data relevant to my insurance records.

If a customer expressed a desire to purchase insurance with an insurance company represented by Hollander Insurance Agency, Inc., then Hollander would assist the customer in filling out a "Cancellation Request/Policy Release" to be submitted to American Family. Numerous examples were submitted at the time of hearing as Plaintiff's Exhibit 9.

As set forth above, on August 1, 2008, Hollander sent the notification letter to approximately 1200 customers. The record is silent regarding how many insurance policies were in force. Hollander estimated that approximately 200 customers have switched since August 1, 2008 and are now customers of Hollander Insurance Agency, Inc. According to Stephen Goldermann, district sales manager for American Family, approximately 270 policies were "lost" between August 1, 2008 and December 1, 2008. According to Goldermann, the retention rate in this district is historically above 87%.

### D. Electronic Databases

Of particular concern to American Family is Hollander's use of information obtained from American Family's electronic database, known as ADS (which apparently stands for "agency database system"). According to Hollander, the electronic database was started in 1986 in order to assist American Family agents in quoting insurance. The system has become more sophisticated over time and, according to Goldermann, contains detailed policy information such as the premium, insurance rating, household members, dates of birth, social security numbers, and other information. Goldermann testified that ADS is "for agents to use to service their business; to market their business."

Hollander admitted accessing ADS prior to August 1, 2008 for legitimate business purposes. Hollander denied sharing any of the ADS information with persons not associated with American Family. While certain ADS reports were printed out (*see* Plaintiff's Exhibit 6), Hollander testified that he returned all of the materials to Goldermann on August 11, 2008 and did not retain any printed lists or policy information. Hollander testified, however, that a list of customers printed in September 2007 was used to send out the notification letter dated July 31, 2008.[1]

According to Hollander, a substantial amount of information regarding American Family insureds is available to most insurance agents through a database known as

---

[1] According to Plaintiff's Exhibit 6, a list of "all active policies by name" was printed by Hollander on September 19, 2007.

C.L.U.E. (Comprehensive Loss Underwriting Exchange). Following the hearing, the parties submitted a Joint Fact Stipulation (docket number 30), providing the Court with information regarding the C.L.U.E. database. In short, insurance companies may contract with C.L.U.E. to access prior claim information for purposes of underwriting and rating. "Data provided in C.L.U.E. reports includes policy information such as name, date of birth and policy number; claim information such as date of loss, type of loss and amounts paid; and vehicle information."[2] More than 95% of insurers writing automobile insurance coverage, including American Family, have access to the C.L.U.E. database. Hollander has access to the C.L.U.E. database. While C.L.U.E. provides information regarding claims made over the last seven years, it does not include current policy information, such as premiums charged or expiration dates. The only policy information available in the C.L.U.E. database is the policy in effect at the time of the covered loss. C.L.U.E. can only be used for underwriting purposes and cannot be used to prospect for customers. "In other words, insurance companies and agents cannot mine data for individuals who are prospective customers without the express knowledge and consent of those customers."[3]

## V. DISCUSSION

American Family asks that the Court enter a preliminary injunction, prohibiting Hollander from violating the terms of Section 6(k) of the Agent Agreement. Specifically, American Family asks that Hollander be ordered not to induce or attempt to induce any of his American Family customers to cancel or replace their American Family insurance policies. For his part, Hollander argues that Section 6(k) is unenforceable, but that he has not violated its terms in any event. Specifically, the parties disagree regarding whether the notification letter of July 31, 2008 violated the provisions of Section 6(k), and they disagree regarding whether Hollander's ongoing activities violate Section 6(k).

---

[2] *See* Joint Fact Stipulation (docket number 30), ¶ 1 at 1.

[3] *Id.*, ¶ 7 at 2.

Hollander testified that after mailing the notification letter on August 1, 2008, he has not *initiated* contact with any former customers. American Family asks that he be prohibited from conducting business with any of his former customers, regardless of who initiates the contact. That is, American Family argues that if a former customer contacts Hollander and requests a quote from a company now represented by the Hollander Insurance Agency, Inc., he must refuse.

In determining whether a preliminary injunction should issue under FEDERAL RULE OF CIVIL PROCEDURE 65, the Court is guided by the familiar principles found in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981).

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Id.* at 114. "In balancing the equities no single factor is determinative." *Id.* at 113. American Family has the burden of proving that the issuance of a preliminary injunction is appropriate. *Baker Elec. Co-op, Inc. v. City of Minneapolis*, 28 F.3d 1466, 1472 (8th Cir. 1994). The Court will consider each of the *Dataphase* factors in turn.

### A. The Threat of Irreparable Harm to American Family

The first *Dataphase* factor is whether irreparable harm will be caused to the movant if a preliminary injunction is not issued. *Dataphase*, 640 F.2d at 114. While the *Dataphase* Court suggested that "no single factor is determinative," it also indicated that a preliminary injunction should not issue if the movant will not suffer irreparable harm. *Id.* at 114, n.9 ("This Court previously noted that under any test the movant is required to show the threat of irreparable harm. (citations omitted) Thus, the absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction."). The "threshold inquiry" is whether the movant has shown the threat of irreparable injury. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991). *See*

also *Baker Elec.*, 28 F.3d at 1472 ("[A] party moving for a preliminary injunction is required to show the threat of irreparable harm."); *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734, 738 (8th Cir. 1989) (same).

Hollander argues that American Family cannot meet its threshold burden of showing a threat of irreparable harm because it has an adequate remedy at law. *See Frank B. Hall & Co. v. Alexander & Alexander*, 974 F.2d 1020, 1025 (8th Cir. 1992). According to Hollander, "[t]here is no **ongoing** alleged wrongdoing here."[4] (emphasis in original) Hollander argues that American Family can sue for money damages and, therefore, has an adequate remedy at law. Hollander claims that "American Family's alleged damages are both certain and quantifiable."[5]

American Family claims, on the other hand, that Hollander's wrongful conduct *is* ongoing. According to American Family, Hollander continues to "solicit" American Family customers, "which will cost the company a significant amount of lost business."[6] Because of the potential for repeat business and referrals, American Family argues that it "is very difficult to quantify the amount of lost business and money damages Hollander's unlawful solicitations have cost and will continue to cost American Family."[7]

Hollander argues that even if his activities during the year following his termination with American Family are restricted by Section 6(k) of the Agent Agreement, his ongoing activities (responding to inquiries, providing quotes from competing companies, assisting customers in filling out cancellation requests, etc.) do not violate the terms of the agreement. *If* those activities violate the agreement, then the harm to American Family is ongoing.

---

[4] *See* Hollander's Brief at 31 (docket number 15-2 at 31).

[5] *Id.*

[6] *See* American Family's Brief at 13 (docket number 2-2 at 13).

[7] *Id.*

Irreparable harm may be established even if a valid damages claim may be available.

> Irreparable harm may be established through a showing that the moving party does not have an adequate remedy available at law. Conversely, proof of the existence of an adequate legal remedy supports an inference of the absence of irreparable harm. The mere availability of a valid damages claim, however, does not preclude the issuance of a preliminary injunction because money damages may not fully compensate a movant's less tangible injuries.

*Moore Business Forms, Inc. v. Wilson*, 953 F. Supp. 1056, 1062 (N.D. Iowa 1996) (internal citations omitted). Injury to goodwill or damage to business relationships may constitute "the sort of intangible injuries which may be found to be irreparable harm for the purpose of weighing the propriety of an injunction." *Id.*

In *N.I.S. Corp. v. Swindle*, 724 F.2d 707 (8th Cir. 1984), an insurance company brought an action seeking injunctive and declaratory relief against three former insurance agents, to enforce the restrictive covenants found in their employment contracts prohibiting certain competition following the termination of the employment relationship. In affirming the district court's granting of a preliminary injunction, the Eighth Circuit Court of Appeals found that the insurance company had met the first *Dataphase* factor.

> First, N.I.S. has shown a threat of irreparable harm. The district court found that the individual defendants were each affirmatively soliciting business from holders of Ozark/N.I.S. policies. If the noncompete agreements are valid, then we think an irreparable injury has been shown.

*Id.* at 710. While Hollander was an independent contractor and not an employee of American Family, the Court believes that the legal principle is the same. *If* Hollander is violating the restrictive provisions of Section 6(k), then there is a "threat of irreparable harm" to American Family. *Moore Business Forms*, 953 F. Supp. at 1063 (finding the plaintiff had met "the minimum initial hurdle" of showing a threat of some irreparable harm where the defendants continued to conduct business with the plaintiff's customers);

*Wachovia Securities, LLC v. Stanton*, 571 F. Supp. 2d 1014, 1046 (N.D. Iowa 2008) (the "mere violation" of a non-solicitation covenant "suffices to show irreparable harm").

### B. The Balance Between the Harm to American Family and the Injury that Granting the Injunction Will Inflict on Hollander

The second *Dataphase* factor requires a balancing between the harm to the movant if a preliminary injunction is not issued, and the injury that granting the preliminary injunction will inflict on the nonmovant. *Dataphase*, 640 F.2d at 114. "[T]he balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1436 (N.D. Iowa 1996).

As set forth above, if Hollander engages in activities in violation of Section 6(k) of the Agent Agreement, then there is a threat that American Family will suffer irreparable harm. That is, American Family customers may cancel their policies or allow them to lapse, and obtain insurance from competing companies. Presumably, fewer customers means less profits immediately and in the longer term. At the instant hearing, counsel for American Family argued that if Hollander is prohibited from soliciting American Family customers for one year, then it is less likely that those customers will transfer their business from American Family to Hollander Insurance Agency, Inc. in the future.

Hollander argues that the impact on American Family of allowing him to respond to requests for service initiated by American Family customers is "negligible." According to the American Family website cited by Hollander in his brief, American Family has "approximately 3,975 agents and more than 9 million policies in force."[8] Hollander argues that even if all of his 1200 former American Family customers switched their business to Hollander Insurance Agency, Inc., the overall effect on American Family would still be insignificant.

---

[8] *See* Hollander's Brief at 32 (docket number 15-2 at 32) (citing www.amfam.com/company/about_whychooseus.asp).

Hollander testified that approximately 200 of his former American Family customers have switched since August 1, 2008 and are now customers of Hollander Insurance Agency, Inc. Stephen Goldermann, district sales manager for American Family, testified that approximately 270 American Family insurance policies credited to Hollander were "lost" between August 1, 2008 and December 1, 2008. Obviously, however, those customers and those policies will not be effected by any preliminary injunction. A preliminary injunction will only impact the customers and policies who would have potentially switched from American Family to Hollander Insurance Agency, Inc., *after* the issuance of a preliminary injunction.[9] The Court believes that each customer and each policy will have a much greater effect on the overall success or failure of Hollander Insurance Agency, Inc., than to any overall benefit or detriment to American Family. That is, the injury inflicted on Hollander by the granting of a preliminary injunction is greater than the harm caused to American Family by refusing to grant a preliminary injunction.

### C. The Probability that American Family Will Succeed on the Merits

The third *Dataphase* factor which must be considered in determining whether a preliminary injunction should issue is the probability that the movant will succeed on the merits. *Dataphase*, 640 F.2d at 114. In determining the "probability of success," it is not necessary that the movant prove a greater than 50% likelihood that it will prevail on the merits, if the balance of the other three factors strongly favor the moving party. Id. at 113. However, if a balancing of harms to the parties weighs in favor of the nonmovant, then the moving party faces a "heavy burden" of showing that it will likely prevail on the merits.

> If the chance of irreparable injury to the movant should relief
> be denied is outweighed by the likely injury to other parties

---

[9] The Court suspects that the number of customers and policies affected by any preliminary injunction which may be issued in this case would be substantially lower than the number which have switched since August 1, 2008.

litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

*Id.* The Court will review the "probability of success" on each of American Family's four causes of action.

### 1.   *Computer Fraud and Abuse Act Violation*

In Count I of its Complaint, American Family alleges that Hollander violated the Computer Fraud and Abuse Act ("CFAA"). Specifically, American Family claims that Hollander accessed its Agency Database System ("ADS") with an intent to defraud American Family, in violation of 18 U.S.C. § 1030(a)(4), which provides:

Whoever--

. . .

knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

. . .

shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030(a)(4). Subsection (c) refers to criminal penalties which are applicable. A civil action may be brought to obtain compensatory damages and injunctive relief, however, by "[a]ny person who suffers damage or loss by reason of a violation of this section." 18 U.S.C. § 1030(g). Under the circumstances of this case, a civil action can only be brought if the loss is "at least $5,000 in value." *See* 18 U.S.C. §§ 1030(g) and (c)(4)(A)(i)(I).[10]

---

[10] It should be noted that 18 U.S.C. § 1030 was amended and renumbered, in part, (continued...)

In its brief, American Family does not provide any case authority for its argument that Hollander's activities give rise to a CFAA claim. If a party fails to brief an issue in more than a "perfunctory manner," then the court may consider the issue waived. *Ramirez v. Debs-Elias*, 407 F.3d 444, 447 at n.3 (1st Cir. 2005) (cited with approval in *United States v. Johnson*, 403 F. Supp. 2d 721, 764 (N.D. Iowa 2005)). *See also Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim in his opening brief, it is waived."). Hollander addresses the issue in his brief and acknowledges, albeit in a footnote, that there is a dispute among the courts regarding the proper application of the CFAA. Hollander argues that the CFAA was intended to punish computer "hackers" and has no application to the circumstances presented here.

American Family does not claim that Hollander has accessed American Family's ADS since the relationship between the parties was terminated on August 1, 2008. Hollander admitted that he used a printout generated in September 2007 to send out the notification letter on August 1, 2008. Hollander testified, however, that he returned American Family's computers and all printed-out reports to Goldermann on August 11, 2008. There is no evidence that Hollander has used any information gained from ADS since that time. Accordingly, while the issue of whether Hollander's use of the September 2007 customer list violated the CFAA may be relevant to American Family's claim for damages at the time of trial, it is not directly related to the instant request for preliminary injunction. Nonetheless, to assist the District Court's understanding of the issues, the Court will review the provisions of the CFAA.

The Act was first adopted in 1984 and imposed criminal penalties on persons causing harm to "federal interest" computers. In 1994, the Act was amended to include civil remedies, as set forth in 18 U.S.C. § 1030(g). As suggested by American Family in

---

[10](...continued)
effective September 25, 2008. *See* Public Law 110-326.

its brief, to prove a civil claim under the CFAA, American Family must prove: (1) Hollander accessed a protected computer; (2) Hollander's access was without authorization or exceed authorized access; (3) Hollander's access was with knowledge and intent to defraud; (4) by means of such conduct, Hollander furthered the intended fraud; and (5) the loss to American Family was at least $5,000 in value during any 1-year period.

The fighting issue in this case is whether Hollander's access was "without authorization" or exceed his "authorized access." The Eighth Circuit Court of Appeals has not addressed the issue of whether one who accesses a computer with apparent authorization, and then arguably uses the information for an improper purpose, has violated the terms of the CFAA. Since the briefing in the instant action was completed, however, two district courts in the Eighth Circuit have addressed the issue, reaching opposite conclusions. In *Ervin & Smith Advertising and Public Relations, Inc. v. Ervin*, 2009 WL 249998 (D. Neb.) (decided February 3, 2009), the Court rejected the defendants' argument that since they "were employees at the time they allegedly accessed Plaintiff's computers, they had 'authorization' and thus did not access the computers 'without authorization' or in excess of 'authorized access' as is required by the statute to establish a violation." *Id.* at *7.

> This Court concludes that while the Defendants ordinarily may have been authorized to access the information they appropriated from Plaintiff, that authorization was terminated when Defendants destroyed the agency relationship by accessing and appropriating the protected information for their own personal gain and against the interest of their employer.

*Id.* at *8.

In *Condux International, Inc. v. Haugum*, 2008 WL 5244818 (D. Minn.) (decided December 15, 2008), the plaintiff brought an action alleging, among other things, a claim under the CFAA. The defendant argued that "his position as vice president 'authorized' him to access Condux's computer system and specifically to access the confidential business information and, therefore, Condux is unable to allege that he acted without

authorization or in excess of authorized access." *Id.* at *4. The district court noted that there is a line of cases holding a person civilly liable under the CFAA "when he accesses confidential or proprietary business information from his employer's computers that he has permission to access but then uses that information in a manner that is inconsistent with the employer's interests or in violation of contractual obligations or fiduciary duties." *Id.* Another line of cases holds, however, that "the CFAA is implicated only by the unauthorized access, obtainment, or alteration of information, not the misuse or misappropriation of information obtained with permission." *Id.* The district court in *Condux* adopted the latter view.

> [T]he conduct at the heart of the dispute is not the access of the confidential business information but rather the alleged subsequent misuse or misappropriation of that information. Such allegations, however, are not sufficient to state a claim for violations of [the CFAA].

*Id.* at *6.

I will not belabor this report to the District Court by reviewing at length the cases which fall on each side of this judicial divide. The cases were helpfully gathered by the district court in *Condux* at nn.3 and 4. *Id.* at *4. For the reasons set forth in *Condux* and by the Court in *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962 (D. Ariz. 2008), the Court concludes that it is unlikely American Family will be able to prevail against Hollander on its CFAA claim.

The evidence at the instant hearing established that Hollander accessed ADS on 21 occasions during the year prior to the termination of his relationship with American Family. American Family concedes that Hollander was authorized, and in fact encouraged, to access ADS for specific reasons. American Family argues summarily, however, that "[i]n his capacity as an American Family Agent, Hollander would have no

valid reason for accessing and printing a global list of policyholders."[11] Hollander admits printing out a list of "all active policies by name" on September 19, 2007, but claims that he did so "in order to initiate a personal insurance review strategy."[12] It seems clear that Hollander was "authorized" to access ADS on September 19, 2007. Furthermore, there is no evidence to suggest that Hollander was not authorized to see a list of American Family policyholders credited to him. To "exceed authorized access" one must access a computer with authorization and then use such access to obtain information in the computer which the person is not entitled to obtain. 18 U.S.C. § 1030(e)(6). Accordingly, American Family cannot prove that Hollander accessed the ADS without authorization or by exceeding his authorized access. Even if the information obtained was subsequently used for an improper purpose, there is no violation of the CFAA.

> Given the plain language, legislative history, and principles of statutory construction, the restrictive view of "authorization" is adopted. "A violation for accessing 'without authorization' occurs only where initial access is not permitted. And a violation for 'exceeding authorized access' occurs where initial access is permitted but the access of certain information is not permitted."

*Shamrock Foods*, 535 F. Supp. 2d at 967 (quoting *Diamond Power Intern., Inc. v. Davidson*, 2007 WL 2904119 at 14).

The Court finds it unnecessary to discuss Hollander's additional argument that the CFAA does not allow recovery for the types of loss alleged by American Family.[13] American Family's CFAA claim will not support a preliminary injunction. *See American Family Mut. Ins. Co. v. Rickman*, 554 F. Supp. 2d 766 (N.D. Ohio 2008) (dismissing American Family's CFAA claim under identical circumstances).

---

[11] *See* American Family's Brief at 5 (docket number 2-2 at 5).

[12] *See* Affidavit of Richard N. Hollander, ¶ 38 at 9 (docket number 15-14 at 9).

[13] American Family makes no effort to respond to the argument in its reply brief.

### 2. *Misappropriation of Trade Secrets*

In Count II of its Complaint, American Family claims that Hollander misappropriated its trade secrets, including a customer list, in violation of Iowa Code Chapter 550. On August 1, 2008, Hollander sent a notification letter to approximately 1,200 American Family customers credited to his agency. Hollander testified that he obtained the names and addresses of those persons from a report of "all active policies by name" which he printed out from the Agency Database System ("ADS") in September 2007. Hollander testified, however, that the printout was returned to Steve Goldermann at American Family on August 11, 2008, along with American Family's computers, files, and all other printed-out materials. That is, Hollander claims that he used the list on one occasion--to mail the notification letter--and it has not been used since that time.

American Family argues that prior to the termination of the parties' relationship, Hollander was entrusted with "valid trade secrets, including, but not limited to, its customer list, customer expiration dates, policy information, customer financial information, computer system, computer records, software, related databases, and other customer information."[14] As noted by Hollander in his brief, however, the only evidence regarding Hollander's use of the alleged trade secrets is his "one-time use of customer names and addresses in order to notify then-current clients that he would no longer be their insurance agent."[15] Whether the customer list constituted a trade secret, and whether Hollander misappropriated the list thereby giving rise to monetary damages, will be decided at the time of trial. Since there is no evidence that Hollander retained any information obtained from the ADS, however, the Court concludes that it is not the proper subject of a preliminary injunction. That is, the Court will not enjoin Hollander's use of information which he does not possess.

---

[14] *See* Complaint, ¶ 34 at 6-7 (docket number 1 at 6-7).

[15] *See* Hollander's Brief at 19 (docket number 15-2 at 19).

Nonetheless, in order to give the District Court a fuller understanding of the issue, I will briefly address the misappropriation of trade secrets claim. Preliminarily, the parties apparently disagree regarding which state's law applies. In its complaint, American Family alleges a violation of Iowa Code Chapter 550; and in its brief, American Family cites Iowa case law. Hollander argues in his brief that Wisconsin law applies, citing the provisions of the agent agreement.[16] In its reply, American Family concedes that Wisconsin law governs its contract claim, but argues, without citation to authority, that Wisconsin law does not apply to the remaining claims.[17]

Regarding the misappropriation of trade secrets claim, the Court finds it unnecessary to engage in a detailed analysis of choice-of-law rules, because the law in Iowa and Wisconsin appears to be substantially the same. *Interbake Foods, LLC v. Tomasiello*, 461 F. Supp. 2d 943, 957 (N.D. Iowa 2006) ("Before any choice of law need be made, there must be a 'true conflict' between the laws of the possible jurisdictions on the pertinent issue.") The Iowa Uniform Trade Secrets Act (Iowa Code Chapter 550) and the Wisconsin Uniform Trade Secrets Act (Wisconsin Statutes 134.90) are both derived from the Uniform Act and are substantially identical in their definition of "trade secret." The Wisconsin statute provides that "[t]his section shall be applied and construed to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws." Wisconsin Statute 134.90(7).

The Uniform Act in both states defines a "trade secret" to include "information" which "derives independent economic value" from not being "readily ascertainable," and

---

[16] *See* American Family Agent Agreement, § 7(d) at 8 (Plaintiff's Exhibit 2) ("This agreement shall be deemed to have been made within the State of Wisconsin and shall be interpreted and construed in accordance with the laws of the State of Wisconsin.").

[17] "Hollander is correct that the contract claim is governed by Wisconsin law per the Agent Agreement choice of law clause. Hollander [sic] disputes that the remaining claims, which are not contract claims, are governed by Wisconsin law." *See* American Family's Reply at 2, n.1 (docket number 26 at 2).

is the subject of reasonable efforts to "maintain its secrecy." *See* Iowa Code Section 550.2(4) and Wisconsin Statutes Section 134.90(1)(c). Iowa has given a "broad interpretation of 'information' that could legally constitute 'trade secrets.'" *Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 646 (Iowa 1995).

> Business information may also fall within the definition of a trade secret, including such matters as *maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures*.

*Id.* at 646-647 (emphasis in original) (quoting *US West Communications, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993)).

Recently, the Iowa Supreme Court cited the Restatement (Third) of Unfair Competition (1995) as setting forth what the Court considered to be "the appropriate scope" of a "trade secret" as defined in Iowa Code Section 550.2(4):

> A trade secret can consist of a formula, pattern, compilation of data, computer program, device, method, technique, process, or other form or embodiment of economically valuable information. A trade secret can relate to technical matters such as the composition or design of a product, a method of manufacture, or the know-how necessary to perform a particular operation or service. A trade secret can also relate to other aspects of business operations such as pricing and marketing techniques or **the identity and requirements of customers**.

*Cemen Tech, Inc. v. Three D Industries, LLC*, 753 N.W.2d 1, 7 (Iowa 2008) (emphasis added). *See also American Express Financial Advisers, Inc. v. Yantis*, 358 F. Supp. 2d 818, 831 (N.D. Iowa 2005) (finding that client names and addresses likely fall within the legal definition of "trade secret" as set forth in Iowa Code Section 550.2(4)).

In his brief, Hollander cites *Corroon & Black-Rutters & Roberts, Inc. v. Hosch*, 325 N.W.2d 883, 885 (Wis. 1982), for the proposition that "an insurance agency's customer list is not a trade secret." *Corroon* was decided prior to Wisconsin's adoption of the Uniform Trade Secrets Act, however, and its black-letter pronouncement is no longer good

law. *See Burbank Grease Services, LLC v. Sokolowski*, 717 N.W.2d 781, 793 (Wis. 2006).

This issue was addressed by the Court in *American Family Mut. Ins. Co. v. Roth*, 2005 WL 3700232 (N.D. Ill.) (applying Wisconsin law). There, the Court granted a preliminary injunction against two former American Family agents, finding that information obtained from American Family's computerized database, including the customer list, fell within the protections of the Wisconsin Trade Secrets Act.

> In any event, AFM's customers are not readily ascertainable by proper means. Indeed, they are not ascertainable by any means except logging into AFM's highly regulated and protected computerized database. Without a customer list, there is absolutely no way the Roths could identify the more than 1,000 customers credited to them. They do not claim they have committed to memory the names, and such a claim would be inherently incredible.

*Id.* at *19. It should be noted, however, that the defendants in *Roth* downloaded and printed approximately 1,500 pages of policy information from the computer database two days before their agency was terminated, and apparently used that information to solicit American Family policyholders following the termination. In the instant action, there is no evidence that Hollander retained any of the ADS information or used it for any purpose other than the notification letter mailed on August 1, 2008.

The Court believes that it is likely that American Family will be able to prove at the time of trial that the names and addresses of its customers constituted a "trade secret" under either Iowa or Wisconsin law. Whether Hollander's use of that list to send a notification letter to customers constituted a misappropriation of the trade secret will be determined at the time of trial. Since there is no evidence that Hollander's use of the customer list is ongoing, however, the Court concludes that it is not the subject of a preliminary injunction.

### 3. Breach of Contract

In Count III of its Complaint, American Family claims that Hollander is in breach of the Agent Agreement. American Family asserts in its reply brief that "[t]here is presently just one issue before the Court."[18] According to American Family, the "one issue" is whether Hollander should be "enjoined from violating paragraph 6k of his Agent Agreement."[19]

It is undisputed that the parties entered into an agent agreement, effective January 1, 1993. Section 6(k) of that agreement purports to restrict Hollander's activities for a period of one year following termination of the agreement. Hollander argues, however, that the restrictive provisions of Section 6(k) are unenforceable under Wisconsin law. Alternatively, Hollander argues that he did not violate the terms of Section 6(k) in any event.

Again, the Court begins its analysis by noting that the issue of whether Hollander's notification letter dated July 31, 2008 violated the restrictions of Section 6(k) is not presently before the Court. Whether such a violation occurred, thereby giving rise to damages, will be determined at the time of trial. Rather, the issue before the Court is whether Hollander's *ongoing* activities probably violate Section 6(k) and, therefore, should be enjoined.

### a. Are the Restrictive Provisions of Section 6(k) Enforceable?

The parties agree that pursuant to the terms of the agent agreement, Wisconsin law is applicable to American Family's contract claim. The general principles governing restrictive provisions imposed on an employee following termination of an employment relationship were summarized by the Wisconsin Supreme Court as follows:

> This Court has adopted the following canons of construction of restraints against competition in employment contracts: These

---

[18] *See* American Family's Reply Brief at 2 (docket number 26 at 2).

[19] *Id.*

> restrictions are *prima facie* suspect; they must withstand close
> scrutiny to pass legal muster as being reasonable; they will not
> be construed to extend beyond their proper import or further
> than the language of the contract absolutely requires; they are
> to be construed in favor of the employee.

*Streiff v. American Family Mut. Ins. Co.*, 348 N.W.2d 505, 510 (Wis. 1984). *See also*

*Hillis v. Waukesha Title Co., Inc.*, 576 F. Supp. 1103, 1106 (E.D. Wis. 1983) ("The

Wisconsin legislature has not established a *per se* rule that covenants restricting

competition after a term of employment are illegal contracts in restraint of trade. Rather,

a restrictive covenant is enforceable if it is found to be reasonable in the particular

circumstances of its operation.") (citing *Rollins Burdick Hunter of Wisconsin, Inc. v.*

*Hamilton*, 304 N.W.2d 752 (Wis. 1981)).

There are "five basic requirements necessary to enforcement of a restrictive

covenant":

(1)   The agreement must be necessary for the protection of
      the employer or principal;

(2)   it must provide a reasonable time period;

(3)   it must cover a reasonable territory;

(4)   it must not be unreasonable as to the employee; and

(5)   it must not be unreasonable as to the general public.

*Chuck Wagon Catering, Inc. v. Raduege*, 277 N.W.2d 787, 792 (Wis. 1979); *See also*

*Pollack v. Calimag*, 458 N.W.2d 591, 598 (Wis. App. 1990) (providing that the covenant

must not be "harsh or oppressive" to the employee and must not be "contrary to public

policy").

Wisconsin statutory law provides that a restrictive covenant imposed on an agent

after termination of the agency is "lawful and enforceful" only if the restrictions are

"reasonably necessary" for the protection of the principal. Wisconsin Statutes Section

103.465. In Wisconsin, any restrictive covenant imposing an "unreasonable restraint" is

unenforceable, "even as to any part of the covenant or performance that would be a

reasonable restraint." *Id.*

The Court believes that the five basic requirements necessary to enforce a restrictive covenant are met easily here. First, the agreement is necessary for American Family's protection. Obviously, American Family has an interest in maintaining a relationship with its customers. Because its contact with its customers is generally only through its agents, however, American Family has an interest in making sure that the agent does not trade on his personal relationships with customers, to American Family's disadvantage. The Wisconsin Supreme Court has expressed a similar view:

> The purpose of a covenant restraining an agent from competing with his principal after he leaves his principal's service is to prevent for a time the competitive use of information or contacts gained as a result of that service. In many businesses the relationship with customers is the most valuable asset of the enterprise. In recognition of this fact, customer goodwill has been recognized as a property interest in and of itself. Customer goodwill has value to the extent that a customer knows and feels he can rely upon the salesperson he is dealing with. In many cases a business's agent may be the sole contact customers have with that business.

*Chuck Wagon Catering*, 277 N.W.2d at 792. Accordingly, American Family has met the first "basic requirement" necessary to enforce the restrictive covenant.

Second, the time restriction found in the Agent Agreement is reasonable. The restrictive provision limits Hollander's activities for a period of one year. Given the circumstances of this case, the Court finds that to be a reasonable length of time. *See*, *Pollack*, 458 N.W.2d at 599 ("Two-year restraints generally are considered reasonable in Wisconsin."); *Chuck Wagon Catering*, 277 N.W.2d at 794 (holding that a one-year restriction was "well within the rule" established by Wisconsin common law).

Third, while Section 6(k) does not define a geographical "territory," it limits the restriction to American Family customers "credited to [Hollander's] account at the time of termination." "A restrictive covenant is not *per se* invalid merely because it lacks an express geographic limitation." *Hillis*, 576 F. Supp. at 1106 (citing *Rollins*, 304 N.W.2d at 755). In Wisconsin, a restrictive covenant is considered reasonable as to territory if it

is limited to the customers actually serviced by the former agent. *Chuck Wagon Catering*, 277 N.W.2d at 793. The Court finds that Section 6(k) is limited appropriately in scope.

Fourth, the Court does not believe that the restrictions set forth in Section 6(k) are harsh or oppressive to Hollander. The restrictive provisions do not prevent Hollander from selling insurance. Indeed, Hollander is not prevented from selling insurance to American Family customers. Instead, Section 6(k) simply limits Hollander's activities regarding policyholders credited to his account at the time the relationship between the parties was terminated. *See Kovarik v. American Family Ins. Group*, 108 F.3d 962 (8th Cir. 1997) (applying North Dakota law) (finding that an identical provision did not violate North Dakota's statute limiting restraint of trade).

Finally, the restrictive provisions "must not be unreasonable as to the general public" or "contrary to public policy." The Court concludes that the restrictions imposed on Hollander by Section 6(k) do not have any substantial adverse effect on the general public. There are lots of insurance companies and lots of insurance agents. Nothing in Section 6(k) prevents an American Family policyholder from cancelling his or her policy and purchasing insurance elsewhere.

Indeed, in arguing that the provisions of Section 6(k) are unenforceable, Hollander does not claim that they fail to comply with the basic requirements set forth in *Chuck Wagon Catering*. Instead, Hollander points to Section 4(i) of the Agent Agreement and argues that since it is unduly restrictive, "both provisions are unenforceable."[20] Section 4(i) of the Agent Agreement provides:

> You Agree:
>
> . . .
>
> To maintain a good reputation in your community and to direct your efforts toward advancing the interests and business of the Company to the best of your ability, to refrain from any practices competitive with or prejudicial to the Company and

---

[20] *See* Hollander's Brief at 25 (docket number 15-2 at 25).

>to abide by and comply with all applicable insurance laws and
>regulations.

*See* American Family Agent Agreement, Section 4(i) at 3 (Plaintiff's Exhibit 2).

While American Family fails to address this argument in its reply brief, the Court concludes that Hollander is overreaching. Section 4(i), entitled "Mode of Conduct," describes the agent's efforts and behavior during the course of the parties' relationship. Section 6(k), entitled "Your Activity After Termination," governs an agent's activities after the agency relationship is terminated. The cases cited by Hollander provide no support for his argument. In *Streiff*, both of the restrictive provisions, including one that was found to be overbroad, placed restraints on the agent's activities following termination of the agreement. The Court found that the two restrictive provisions were "indivisible," and that since one of the provisions was unenforceable as being overbroad, the other provision was also unenforceable pursuant to Wisconsin Statutes Section 103.465. 348 N.W.2d at 510. In this case, however, Sections 4(i) and 6(k) are unrelated and clearly "divisible." Therefore, the holding in *Streiff* has no application here. The Court finds that American Family has met its burden of establishing that the restrictive provisions found in Section 6(k) of the Agent Agreement are probably enforceable.

### b.    Do Hollander's Activities Violate Section 6(k)?

While the Court has concluded that the restrictive provisions found in Section 6(k) are probably enforceable, that does not answer the question of what activity is prohibited. That is, in the Court's view the fighting issue regarding the preliminary injunction is not a question of *whether* Section 6(k) is enforceable and restricts Hollander's activities, but rather *what* activities are restricted.[21] Hollander testified that he does not initiate contact with his former American Family customers, but admitted that he responds to their inquiries. Hollander provides quotes from other insurance companies and assists

_____

[21] Once again, the Court notes that the issue of whether Hollander's notification letter dated July 31, 2008 violated the restrictions of Section 6(k) is not presently before the Court. That issue will be determined at the time of trial.

customers in filling out cancellation notices if they decide to switch to another company. American Family argues that these activities violate Section 6(k). Hollander argues that they do not.

Boiled down, Section 6(k) provides that Hollander will not "directly or indirectly induce [or] attempt to induce" any of his American Family customers to "cancel [or] replace" any of their American Family policies. Accordingly, the Court must determine whether Hollander's activities are an attempt to "directly or indirectly" induce his former American Family customers to change companies. Surprisingly, neither party offers any significant argument or authority on this fundamental question.[22]

The Court believes that it is significant that the Agent Agreement does not limit Hollander's restricted activities to *solicitation* of American Family policyholders. To "solicit" suggests initiating contact with another person to attempt to persuade them. The Court believes, however, that "induce" is a broader term. One can "induce" action without regard to who initiates the contact. At the least, Hollander's ongoing actions (responding to inquiries, providing quotes, and assisting the completion of cancellation forms) are an indirect attempt to induce the customer to switch insurance companies. Pursuant to Section 6(k) of the Agent Agreement, Hollander cannot "directly or indirectly induce [or] attempt to induce" any of his American Family customers to cancel or replace their American Family policies for a period of one year. Accordingly, the Court finds that American Family has met its burden of establishing that Hollander's ongoing activities probably violate Section 6(k) of the Agent Agreement.

### 4.    *Intentional Interference With Contractual Obligations*

In Count IV of its Complaint, American Family claims that Hollander intentionally and wrongfully interfered with American Family's insurance contracts with its customers.

---

[22] Hollander cites *FTI Consulting, Inc. v. Graves*, 2007 WL 2192200 (S.D.N.Y. 2007), and *Ecolab, Inc. v. K.P. Laundry Machinery, Inc.*, 656 F. Supp. 894 (S.D.N.Y. 1987). These cases focus, however, on what constitutes a "solicitation," rather than the meaning of "induce."

To prevail on this claim, American Family must prove that: (1) American Family had a contractual relationship with a third party; (2) Hollander interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) Hollander was not justified or privileged to interfere. *AON Risk Services, Inc. v. Liebenstein*, 710 N.W.2d 175, 189 (Wis. App. 2005).[23]

American Family claims that Hollander's July 31, 2008 letter, and his ongoing activities when contacted by former American Family customers, constitute tortious interference with its contractual relationship with American Family policyholders. Even if American Family can prove that Hollander intentionally interfered with American Family's contractual relationship with its customers, however, the Court does not believe that it is probable that American Family can prove that Hollander's interference was "improper" or "not privileged."

Under Wisconsin law, "the transmission of truthful information is privileged, does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with a contract." *Liebe v. City Finance Co.*, 295 N.W.2d 16, 18 (Wis. App. 1980).

> Wisconsin courts have long recognized the concept of privilege in the area of tortious interference with contract. Not all intentional interference with contract is actionable. Only "one who, without a privilege to do so, induces or otherwise purposely causes a third person not to perform a contract with another is liable." Wisconsin courts have also intimated that transmission of truthful information is proper by stating that

---

[23] While stated slightly differently, the five elements of intentional interference with a contract in Iowa are substantially the same. *See Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006) ("The elements of the tort of intentional interference with an existing contract are: (1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.").

> improper means of interfering with contracts include transmission of false information.

*Id.* at 19. *See also Mackenzie v. Miller Brewing Co.*, 608 N.W.2d 331, 349 (Wis. App. 2000). There is no evidence in the record to suggest that the information provided by Hollander to American Family customers was untruthful.

Similarly, to establish a cause of action in Iowa for tortious interference with an existing contract, the contact must be "improper." *General Elec. Capital Corp. v. Commercial Services*, 485 F. Supp. 2d 1015, 1026 (N.D. Iowa 2007) (citing *Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996). Contracts which are terminable at will, however, are "more properly protected as a prospective business advantage rather than as a contract." *Compiano v. Hawkeye Bank & Trust*, 588 N.W.2d 462, 463 (Iowa 1999). To establish a tort of intentional interference with a prospective business relation, the plaintiff must prove that the defendant "acted with the sole or predominate purpose to injure or financially destroy the plaintiff." *Id.* American Family will be unable to prove that here. Accordingly, it is unlikely that American Family will prevail on its claim of intentional interference with contractual obligations.[24]

### D. The Public Interest

The final *Dataphase* factor to be considered is how the granting of a preliminary injunction would affect the public interest. *Dataphase*, 640 F.2d at 114. It is unclear that the public has a significant interest in this private dispute. While the granting of an injunction may limit Hollander's ability to do business with certain former customers, it will have no effect on the ability of those customers to obtain insurance from other sources. The Court believes that the granting of a preliminary injunction in this case will neither help nor harm the general public interest.

---

[24] The Court assumes that it is common practice for an insurance agent to contact persons who have policies with competing companies and attempt to persuade them to switch companies. American Family has not cited any authority suggesting that this may be considered intentional interference with a contractual obligation.

## VI. SUMMARY

In determining whether or not a preliminary injunction should issue, the Court has focused on Hollander's ongoing activities. That is, whether Hollander's notification letter mailed on August 1, 2008 constituted a misappropriation of trade secrets or a breach of Section 6(k) of the Agent Agreement, thereby giving rise to monetary damages, will be determined at the time of trial and is not the subject of this request for a preliminary injunction. Instead, the Court must determine whether Hollander should be enjoined from responding to requests for quotes by former American Family customers or assisting in the filling out of cancellation forms, even if Hollander does not initiate those contacts.

American Family has established that Section 6(k) of the Agent Agreement, placing restrictions on Hollander's activities for one year following the termination of the agency relationship, is probably enforceable. In addition, American Family has established that Hollander's ongoing activities probably violate the prohibition against directly or indirectly inducing or attempting to induce his former American Family customers to change insurance companies. At the least, by providing quotes from other companies and assisting in the completion of cancellation forms, Hollander is indirectly attempting to induce his customers to change companies.

The Court does not believe that there is a substantial public interest in the issue of whether or not a preliminary injunction should issue in this case. American Family has shown a threat of irreparable injury if Hollander is allowed to continue to respond to requests for service by American Family customers. However, the harm to Hollander caused by the issuance of a preliminary injunction outweighs the harm to American Family which would be caused by the Court's failure to grant an injunction. Nonetheless, after considering all four of the *Dataphase* factors, the Court believes that a preliminary injunction should issue.

## VII. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the District Court **GRANT** American Family's Motion for a Preliminary Injunction (docket number 2), as follows:

> 1.　Prohibiting Hollander from directly or indirectly inducing or attempting to induce, or assist anyone else in inducing or attempting to induce, any American Family policyholder credited to his account at the time of his termination to lapse, cancel, replace, or surrender any American Family insurance policy;

> 2.　Prohibiting Hollander from contacting any policyholders[25] credited to his account as of the end of his American Family agency;

> 3.　Prohibiting Hollander from marketing, touting, quoting, or providing to any policyholders credited to his account as of the end of his American Family agency any information about insurance products competitive to American Family, irrespective of how the contact with Hollander was initiated; and

> 4.　Prohibiting Hollander from assisting any policyholders credited to his account as of the end of his American Family agency in the act of cancelling their American Family policy(ies).

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10) days after being served with a copy of these proposed findings and recommendations, any party may serve and file written objections with the District Court. *The parties are*

---

[25] The evidence at the instant hearing established that approximately 200 customers have already cancelled their American Family policies and have purchased insurance through Hollander Insurance Agency, Inc. To prevent any harm to those customers, it is respectfully recommended that the preliminary injunction not apply to those persons who have already switched from American Family to Hollander Insurance Agency, Inc. That is, Hollander would be permitted to contact and service all of his present customers, including those customers who were formerly American Family policyholders.

*reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if a party is going to object to this Report and Recommendation, a transcript of the hearing held on December 8, 2008 must promptly be ordered.*

DATED this 3rd day of March, 2009.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA